# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE ARGUS RESEARCH GROUP, INC., | : |
| and ARGUS INVESTORS' COUNSEL, | : |
| INC., | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :      NO. 3:06cv1895 (MRK) |
| | : |
| ARGUS MEDIA, INC. and | : |
| ARGUS MEDIA LIMITED, | : |
| | : |
| Defendants. | : |

## MEMORANDUM OF DECISION

Currently pending before the Court is Defendants' (collectively, "Argus Media") Motion for Summary Judgment [doc. # 72], in which Argus Media asks the Court to bar certain of Plaintiffs' (collectively, "Argus Research") trademark and unfair competition claims on the basis of the affirmative defenses of laches and acquiescence and to reject other claims on the merits. For the reasons that follow, Argus Media's motion is GRANTED IN PART and DENIED IN PART.

## I.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (alteration in original).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the plaintiff, *see Anderson*, 477 U.S. at 255; *Holcomb v. Iona College*, 521 F.3d 130, 2008 U.S. App. LEXIS 6897, at *17 (2d Cir. 2008). If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## II.

In light of the Court's determination that disputes of fact exist that require a trial of certain claims, the Court will provide here only a brief outline of the events underlying this lawsuit. Additional facts are discussed as relevant to specific legal issues.

Developed by James Nasmyth, Argus Media began as a weekly publication in 1970 called *Europ-Oil Prices (London)*. The publication was intended to provide subscribers with oil pricing information, which was then not readily available because most oil sales at that time were between private parties. When a French publisher with whom Mr. Nasmyth worked offered a collaboration

in 1975, Mr. Nasmyth agreed. *Petroleum Argus*, the English translation of the French title his collaborator had already chosen, became a twice-weekly publication and gradually included oil pricing information from additional geographic areas. Over time, Petroleum Argus (or in some cases, Energy Argus) – as Argus Media was then known – developed a stable of publications, all of which related to the energy field in some form or another and examined various aspects of energy markets, whether pricing or other news of interest in the energy industry. Argus Media publications have circulated in the United States since the late 1970s, and within the last decade or two, the United States has come to make up a substantial portion of Argus Media's market. Both the company and its publications are widely known by the name "Argus" within the energy community.[1]

For its part, Argus Research was established even earlier – in 1934 – by Harold Dorsey. Argus Research was originally founded in New York to provide independent investment research for institutions and brokerage firms, and it published a weekly report for the investment community, entitled *Argus Weekly Staff Report*. Argus Research also produced various other publications and provided investment recommendations. Over time, Argus Research took on active money-management responsibilities in addition to its research and publication functions. As with Argus Media, Argus Research has consistently referred to itself and its publications as "Argus." In fact, Argus Research trademarked the term "ARGUS" for use in connection with "investment analysis and securities portfolio management services; and broad economic research services of particular interest to the business and investment community" and "investment and economic research reports, analyses

---

[1] As Mr. Nasmyth indicated in his deposition, "Argus" has mythical connotations. Argus Panoptes ("All-Seeing Argus") was a giant with a hundred eyes set by Hera to guard from Zeus the nymph Io (who was temporarily in the unfortunate form of a heifer). According to legend, only a few of the eyes slept at a time, making Argus an ideal watchman.

and guides." Corea Declaration [doc. # 91-2], Ex. 4. Although Argus Research has always reported on the energy industry, Argus Research's focus appears to have been on investment analysis and advice, while Argus Media has traditionally focused on commodities pricing and developments in energy markets. As noted, both companies have been known as "Argus" within their respective communities.

The parties attempted to resolve some of their differences by means of a Settlement Agreement (the "Agreement") signed in 2001. By December 2000, Argus Media had filed applications to trademark the terms "PETROLEUM ARGUS," "ENERGY ARGUS," and "ENERGY ARGUS & Design." The latter two applications had either been registered or were awaiting registration when Argus Research sought to oppose the registration of "PETROLEUM ARGUS." The two parties then began negotiations to resolve their differences, and in the course of those discussions, Argus Media provided Argus Research with over 175 pages of sample Argus Media publications and marketing materials. The parties, with the assistance of counsel, were able to reach an accord and on August 8, 2001, they signed a Settlement Agreement. As will be discussed below, the parties disagree as to the meaning of some of the terms of that agreement.

On March 2, 2003, Sharon Wagoner, one of Argus Research's principals and its former trademark counsel, received an email from her cousin Alan Dorsey, in which he identified a number of "ARGUS" marks that potentially infringed on Argus Research's mark. One of those potential infringers was "Argus Daily Market Reports," which, Mr. Dorsey noted, was accessible at argusonline.com and argusmediagroup.com. These two websites were launched by Argus Media in 2002 and included use of the "ARGUS MEDIA" trademark. Ms. Wagoner claims not to have visited the Argus Media websites suggested by her cousin. However, internal Argus Research emails

suggest that Argus Research contacted one of the other potential infringers identified by Mr. Dorsey in 2004, *see* Ewing Declaration [doc. # 74], Ex. P, and Argus Research sued the other potential infringer identified by Mr. Dorsey in 2005, *see* Ewing Reply Declaration [doc. # 104], Exs. V, A.

Another Argus Research employee, Gary Hovis, observed an Argus Media booth at the annual John S. Herold Energy Conference in September 2004. The booth featured the "ARGUS MEDIA" trademark on its signage and publications. Although it is unclear whether Mr. Hovis connected the Argus Media booth with Petroleum Argus, as Argus Media was previously known, Mr. Hovis did pick up a copy of *Petroleum Argus*, contained in a folder marked "Argus Media," from the booth. The next day, Mr. Hovis told Ms. Wagoner about the Argus Media booth and gave her the publications he had taken. Erin Smith, another Dorsey family member working for Argus Research, also attended the Herold Conference. She testified at her deposition that she was asked several times at the conference whether she worked for Argus Media. *See* Corea Decl. [doc. # 91-2], Ex. 40, at 16-17. However, it is unclear whether she reported this confusion to anyone at Argus Research, and if so, to whom.

Argus Research claims that Argus Media has changed its business by marketing more aggressively to hedge funds and investment banks and by altering the content of its publications to focus more on stock prices and other investment-related information. Argus Research also claims that the parties' Agreement prohibits Petroleum Argus from adopting "ARGUS" or "ARGUS MEDIA" as its trademarks. As a result, Argus Research has brought this action against Argus Media, asserting the following claims: federal trademark infringement in violation of § 32(1) of the U.S. Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1114(1); false designation of origin and unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); federal trademark

dilution in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); common law trademark infringement and unfair competition in violation of Connecticut law; unfair competition under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b; and common law breach of contract.

### III.    Breach of Contract

The Court turns first to Argus Research's breach of contract claim, as the Court's resolution of that claim may bear on the other claims. Because the Agreement is relatively brief and the parties disagree as to the import of its language, the Court sets out the relevant provisions in full:

1. Petroleum Argus Limited shall amend the identification of goods and services set forth in the application to register PETROLEUM ARGUS (App. No. 75/337,886) to the following:

> Electronic publications, namely, journals, newsletters, reports, newspapers, pamphlets, periodicals, magazines, and manuals *reporting oil pricing worldwide, developments in the oil industry, and related topics such as oil drilling, technology and infrastructure and not including information concerning asset management and investment advice relating to stocks and bonds* in electronic format downloadable form and made available via a global computer network on a subscription basis.

> Printed publications, namely journals, newsletters, reports, newspapers, pamphlets, periodicals, magazines, and manuals *reporting oil pricing, developments in the oil industry, and related topics such as oil drilling, technology and infrastructure and not including information concerning asset management and investment advice relating to stocks and bonds*, in Class 16.

> Financial information services regarding the energy industry in the nature of conveying pricing information about fuel and energy products via a global computer network *and not including information concerning asset management and investment advice relating to stocks and bonds*, in Class 36.

2. Argus Research Group, Inc. will not oppose or seek to cancel the trademark application for PETROLEUM ARGUS (SN 75/337,886) owned by Petroleum Argus Ltd. or otherwise contest or challenge Petroleum Argus' rights in the mark

PETROLEUM ARGUS as shown in that application for the goods and services as set forth in that application as amended pursuant to paragraph 1 of this agreement or Petroleum Argus' ownership thereof and exclusive rights therein or do any act or thing in derogation thereof.

3. Argus Research Group, Inc. will not oppose or seek to cancel the trademark application for ENERGY ARGUS & Design (Reg. No. 2,387,568) and ENERGY ARGUS & Design (Reg. No. 2,450,022) owned by Petroleum Argus Ltd. or otherwise contest or challenge Petroleum Argus' rights in the mark ENERGY ARGUS as shown in the registrations for the goods and services as set forth in the registrations or Petroleum Argus' ownership thereof and exclusive rights therein or do any act or thing in derogation thereof.

Binks Declaration [doc. # 72-7], Ex. N. The Agreement includes a choice of law provision selecting New York law, and further states that "[t]his is the entire agreement." *Id.*

According to the Amended Complaint, "[Argus Research's] agreement with [Argus Media] was based on the mutual understanding and agreement that [Argus Media] would refrain from the use or registration of any mark including the term ARGUS other than PETROLEUM ARGUS and ENERGY ARGUS & Design." Am. Compl. [doc. # 67] ¶ 21. Thus, Argus Research alleges that Argus Media has breached the Agreement: (1) by filing trademark applications directed at "ARGUS" marks without the explicit disclaimer "and not including information concerning asset management and investment advice relating to stocks and bonds"; (2) by filing trademark applications directed at "ARGUS" marks other than "PETROLEUM ARGUS" and "ENERGY ARGUS & Design," including "ARGUS" and "ARGUS MEDIA"; and (3) by using any "ARGUS" marks in connection with "information concerning asset management and investment advice relating to stocks and bonds." *See id.* ¶¶ 73-78. To the extent Argus Media has not breached the explicit terms of the Agreement, Argus Research claims that Argus Media has nevertheless breached the covenant of good faith and fair dealing inherent in all contracts.

A court may grant summary judgment in a contract dispute where the language of the contract is unambiguous. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1183, 1192 (2d Cir. 1996). Under New York law, whether a contract is ambiguous is a question of law for the court to resolve. *See id.* "When the relevant language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion, no ambiguity exists." *Id.* (quotation marks and alteration omitted). The Court may not consider extrinsic or parol evidence in making its determination regarding ambiguity.[2] As the court explained in *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639 (N.Y. 1990),

> A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.

*Id.* at 642.

Argus Research argues that the Agreement is ambiguous because it discusses trademark registration but not "use" of the marks; because use is a necessary prerequisite to any registration, Argus Research contends that use must implicitly be encompassed within the Agreement. The Court disagrees. In a strikingly similar case (decided before the parties in this case executed the Agreement) – *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711

---

[2] Thus, the Court does not consider evidence offered by Argus Research as to the representations of Argus Media's counsel during negotiations, post-signing internal Argus Media emails regarding the alleged interpretation of the Agreement, or allegedly misleading statements regarding the Agreement that Argus Research claims Argus Media made to the U.S. Patent and Trademark Office. Argus Research's assertions that it never would have signed the Agreement if it understood the contract to permit additional uses of "ARGUS" are equally irrelevant.

(S.D.N.Y. 2000) – the parties' contract required the defendant to amend its trademark application, but did not speak explicitly to use. The court there determined that use was not necessarily implicated by a reference to registration, and that parties may decide to separate registration from use depending on the circumstances. *See id.* at 729. Especially in light of the fact that both parties here are sophisticated corporations that were represented by counsel during negotiations, the Court will not read an ambiguity into the contract on the basis of Argus Research's argument. *See Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001) ("An omission or mistake in a contract does not constitute an ambiguity and the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence. Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.") (citation, quotation marks, and alterations omitted). Thus, examining the Agreement "as a whole to determine its purpose and intent," *W.W.W. Assocs.*, 566 N.E.2d at 642, the Court concludes that the contract is unambiguous, and as a result the Court may address Argus Research's claims on summary judgment.

As the language of the Agreement makes clear, this contract had a single purpose and that was to require Argus Media to amend its trademark application for "PETROLEUM ARGUS" in the manner detailed. Argus Research does not allege that Argus Media failed to do so. In return, Argus Research agreed not to oppose, seek to cancel, or otherwise interfere with Argus Media's "PETROLEUM ARGUS" and "ENERGY ARGUS & Design" marks. There simply is no language in the Agreement to suggest that the parties intended to say anything about future registrations of other "ARGUS" marks, or intended to limit use in any particular way, and the Court thus rejects

Argus Research's breach of contract claims regarding any marks other than "PETROLEUM ARGUS" or "ENERGY ARGUS & Design."

The Court also rejects Argus Research's claim that the Agreement sought to limit the use of the "PETROLEUM ARGUS" and "ENERGY ARGUS & Design" marks to the scope of the registrations. As the Court noted above, the unambiguous language of the contract speaks only to registration, and does not constrain use of the marks by either party. *See Times Mirror*, 103 F. Supp. 2d at 729 ("If the parties had intended for Times Mirror to have exclusive use of the mark on fishing tackle boxes, they could have included such an allocation in the Settlement Agreement."). Had Argus Research desired to limit Argus Media's *use* of the "PETROLEUM ARGUS" and "ENERGY ARGUS & Design" marks, it could easily have accomplished that goal by including language in the Agreement to that effect. That Argus Research, represented by counsel, did not do so is telling. The Court will not rewrite the parties' Agreement for them.

Further, even if the Agreement *were* construed to cover use of the "PETROLEUM ARGUS" and "ENERGY ARGUS & Design" marks, Argus Research's breach of contract claim would still fail. The evidence submitted by both parties demonstrates that there has been no material change in the financial information provided by Argus Media in its publications from prior to the signing of the Agreement in 2001 until the present day. During the course of negotiating the Agreement in 2001, Argus Media's counsel sent to counsel for Argus Research approximately 175 pages of Argus Media publications and promotional materials. An examination of those materials makes clear that Argus Media, then publishing under the name Energy Argus or Petroleum Argus, was already engaged in reporting on earnings reports and finances of energy companies, including their stock prices. *See, e.g.*, Ewing Decl. [doc. # 74], Ex. O at P0894, P0904, P0905, P1003, P1015, P1034.

Thus, Argus Research knew or should have known in 2001 what Argus Media was publishing, and could have included an explicit prohibition on Argus Media continuing to *publish* stock price and earnings information on energy companies had it wished to do so. It did not do so. Instead, the disclaimer Argus Media added to its registration application refers to providing "information concerning asset management and investment advice relating to stocks and bonds." Publishing stock prices is simply not the same as providing "asset management and investment advice relating to stocks." Therefore, the Court concludes that no reasonable jury could find that Argus Media had breached the Agreement by merely continuing to publish the same kind of information it had published prior to the Agreement and that Argus Research knew Argus Media was publishing.

Argus Research next turns to the implied covenant of good faith and fair dealing, which inheres in every contract and serves to enforce the reasonable expectations a party has in that contract, even where the express terms of the contract are met. As another district judge in this Circuit has aptly summarized,

> [t]he Second Circuit has indicated that it is the intent and reasonable expectations of parties entering into a given contract that fix the boundaries of the covenant of good faith and fair dealing, provided that those expectations are consistent with the express terms of the contract. Hence, the purpose of the implied covenant of good faith is to further an agreement by protecting a promisee against breach of the reasonable expectations and inferences otherwise derived from the agreement.

*ARI & Co., Inc. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (citations and quotation marks omitted).

Argus Research claims that the reasonable expectations of the parties included Argus Research's belief that the Agreement "limited the use and registration of Defendants' brands to the PETROLEUM ARGUS and ENERGY ARGUS plus design marks in the identified goods and

services." Plaintiffs' Memorandum in Opposition [doc. # 91] at 40. In support of this proposition, Argus Research points to Argus Media's alleged failure to disclose any trademark usage of "ARGUS" in the documents Argus Media provided to Argus Research, statements by Argus Media's counsel regarding the limited nature of Argus Media's business, and Argus Media's failure to communicate the change in its name from Petroleum Argus to Argus Media, which occurred around the time the Agreement was signed.

The Court rejects Argus Research's argument. "New York law is clear that the implied covenant cannot be used to create independent obligations beyond the contract." *ARI & Co.*, 273 F. Supp. 2d at 523. The Agreement, which was specifically identified as the "entire agreement" of the parties, delineates the full extent of the parties' contract regarding the "PETROLEUM ARGUS" and "ENERGY ARGUS & Design" marks. As the Second Circuit stated in its review of the *Times Mirror* case, "[N]o obligation can be implied that would be inconsistent with other terms of the contractual relationship. . . . Having already found that the express terms of the agreements clearly set forth the parties' respective rights . . ., we also conclude that TM cannot avoid the express terms of the contract by relying on the implied covenant of good faith and fair dealing." *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 394-95 (2d Cir. 2002). The same reasoning applies with equal force here.

Argus Research seeks to preserve at least part of its claim for breach of the implied covenant of good faith and fair dealing by distinguishing its allegations regarding Argus Media's use of the "PETROLEUM ARGUS" and "ENERGY ARGUS & Design" marks – which would, if anything, constitute a breach of the explicit terms of the contract – from its allegations regarding Argus Media's additional registration and trademark use of other "ARGUS" marks. The latter, Argus

Research argues, provides an independent ground for breach of the implied covenant. *See Siradas v. Chase Lincoln First Bank, N.A.*, No. 98 CIV. 4028(RCC), 1999 WL 787658, at *6 (S.D.N.Y. Sept. 30, 1999) ("A party may maintain a claim for breach of the duty of fair dealing only if it is based on allegations different than those underlying the accompanying breach of contract claim."); Pls.' Mem. in Opp'n [doc. # 91] at 41.

The Court does not find Argus Research's distinction persuasive. The language of the Agreement is limited to the "PETROLEUM ARGUS" and "ENERGY ARGUS & Design" marks. Yet, in seeking to apply the implied covenant of good faith and fair dealing to Argus Media's use of other marks, Argus Research is seeking impermissibly to "create independent obligations beyond the contract." *ARI & Co.*, 273 F. Supp. 2d at 523. Once again, the Court will not rewrite the Agreement to impose on Argus Media contractual obligations that Argus Research now wishes it had obtained.

To the extent Argus Research believes that Argus Media's currently pending trademark applications infringe on its own "ARGUS" mark, Argus Research should raise those concerns first with the U.S. Patent and Trademark Office, as indeed it has. And to the extent Argus Research feels that Argus Media has included information in its publications that would result in confusion between the two marks, Argus Research may seek to uphold its rights by means of its claims for trademark infringement, dilution, and unfair competition. The Court thus grants summary judgment to Argus Media on Argus Research's breach of contract claim.

## IV.    Laches and Acquiescence

The Court notes as a preliminary matter that Argus Media is seeking summary judgment on Argus Research's Lanham Act and common law trademark infringement and unfair competition

claims only on the basis of Argus Media's affirmative defenses of laches and acquiescence; the underlying merits of Argus Research's claims are not at issue here. *See* Defendants' Memorandum of Law [doc. # 72] at 15 n.6. Although Argus Media has presented a strong case, and may well succeed on its affirmative defenses at trial, the Court believes that disputes of material fact regarding progressive encroachment make summary judgment inappropriate with respect to at least some of Argus Research's claims.

Laches and acquiescence, both equitable defenses, are fundamental threshold matters that a court considering claims of trademark infringement and unfair competition should consider before reaching the merits of those claims. *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 216 (2d Cir. 2003). The elements of the two defenses are similar, but not identical. A defendant claiming laches must show that: (1) the plaintiff had knowledge of the defendant's use of its mark; (2) the plaintiff inexcusably delayed taking action with respect to that use; and (3) the defendant would be prejudiced if the court permitted the plaintiff to assert its rights belatedly. *See Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir. 1980). Actual knowledge on the plaintiff's part is not required; rather, the issue is whether the plaintiff knew or should have known about the allegedly infringing use. As Judge Henry Friendly observed over 40 years ago, "Although the defense of laches generally includes proof of actual knowledge by the party claimed to be barred, . . . this is not an inflexible rule; a plaintiff may be barred when the defendant's conduct has been open and no adequate justification for ignorance is offered." *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir. 1964); *see Polaroid Corp. v. Polarad Elecs. Corp.*, 182 F. Supp. 350, 355 (E.D.N.Y. 1960) ("[W]here the question of laches is an issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already

known by him were such as to put upon a man of ordinary intelligence the duty of inquiry.") (quotation marks omitted).

In contrast to the implied, passive consent in the case of laches, acquiescence requires the "active consent" of the plaintiff, whether express or implied. *See ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67-68 (2d Cir. 2002). Thus, to support a defense of acquiescence, a defendant must show that: (1) the plaintiff actively represented that it would not assert its trademark rights; (2) the delay between that representation and the bringing of suit was not excusable; and (3) the delay caused the defendant undue prejudice. *See id.* at 67.

With respect to delay, if suit is brought outside the statute of limitations, the delay is presumptively unreasonable; if suit is brought within that period, the delay is presumptively reasonable. *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996). Because the Lanham Act does not include a statute of limitations, courts apply the most analogous state statute of limitations, which in this case is Connecticut's three-year statute of limitations for fraud. *See id.* Thus, any delay with respect to claims of which Argus Research was aware as of November 21, 2003 is presumptively unreasonable.

Even if a plaintiff has delayed bringing suit, however, laches or acquiescence may be unavailable for one of several reasons. First and foremost, equity requires that "he who comes into equity must come with clean hands." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (quotation marks omitted). This good-faith component of the laches doctrine denies the benefits of laches to any defendant that has intentionally infringed on the plaintiff's mark. *See id.* ("Appellees thus intentionally traded off the Hermes name and protected products and should

not have been entitled to invoke the doctrine of laches as a defense against Hermes' claims for injunctive relief."). Intentional infringement is a "dispositive, threshold inquiry that bars further consideration of the laches defense." *Id.*

Even assuming no intentional infringement on the defendant's part, a plaintiff's delay in bringing suit may be excused under the doctrine of progressive encroachment. That judge-made doctrine provides that because an initially non-infringing use of which the plaintiff was aware may over time become an infringing use, a plaintiff "has no obligation to sue until the likelihood of confusion looms large and his right to protection has clearly ripened." *ProFitness*, 314 F.3d at 68 (quotation marks and alteration omitted). The Second Circuit has explained that "the doctrine of progressive encroachment allows a plaintiff some latitude in the timing of its bringing suit, permitting it to wait until the likelihood of confusion looms large." *ProFitness*, 314 F.3d at 70 (quotation marks and alteration omitted). Thus, the "doctrine of progressive encroachment . . . focuses the court's attention on the question of whether defendant, after beginning its use of the mark, *redirected its business* so that it more squarely competed with plaintiff and *thereby increased the likelihood of public confusion* of the marks." *Id.* (emphasis added). As this formulation indicates, the likelihood of confusion is intimately related to a finding of progressive encroachment. *See Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, No. 1:03-CV-278, 2005 WL 2076279, at *4 (D. Vt. Aug. 26, 2005) ("[I]n order to evaluate whether the doctrine of progressive encroachment excuses plaintiff's delay in bringing suit, the court must compare the likelihood of confusion from first use of the mark and from its most recent use of the mark.") (alteration omitted). Requiring a redirection of the defendant's business also serves to limit infringement claims that result from "mere growth in the scope of the defendant's business," which is not actionable. *Id.*

Finally, although laches or acquiescence may bar damages on a particular claim, a court may nevertheless grant injunctive relief if it determines that "the likelihood of confusion is so great that it outweighs the effect of plaintiff's delay in bringing suit." *ProFitness*, 314 F.3d at 68; *see Hermes Int'l*, 219 F.3d at 109.

**B.**

Argus Research bases its Lanham Act claims primarily on two aspects of Argus Media's publications. The first is Argus Media's inclusion of certain financial information, such as stock prices, in its publications[3]; the second is Argus Media's use of "ARGUS" or "ARGUS MEDIA" in connection with its publications, as opposed to the prior use of "ENERGY ARGUS" or "PETROLEUM ARGUS."[4]

**1.     Unreasonable Delay.**          Before turning to Argus Research's proffered excuses for its delay in filing suit, the Court first addresses whether laches would otherwise bar Argus Research's claims – that is, whether Argus Research's delay in bringing its claims would be unreasonable, if not excused. With respect to Argus Media's publication of financial information, Argus Research alleges that Argus Media has recently "changed the content of its reports to meet the needs and interests of its newer consumers," for example by "provid[ing] a chart of company share prices." Pls.' Mem. in Opp'n [doc. # 91] at 24. As noted above, however, the Court finds that Argus Research was or should have been aware of the inclusion of such share pricing information in Argus Media's reports well before November 2003. While Argus Media may not have included

_____

[3] As noted above, Argus Research also contends that Argus Media's inclusion of stock pricing information in its publications violates the parties' Agreement.

[4] Argus Research's counsel clarified at argument that Argus Research does not oppose the use of "ENERGY ARGUS" or "PETROLEUM ARGUS" in Argus Media's publications.

publications presenting stock prices in chart form among those sent to Argus Research prior to the signing of the Agreement in 2001, the information itself was indisputably present in Argus Media's publications. Further, other Argus Media publications, dating back to April 1997, did include "World energy share indices" tables of the sort Argus Research now opposes. *See, e.g.*, Binks Reply Declaration [doc. # 103], Ex. S ("This week, *Argus* starts to publish weekly share index values."). The Court thus concludes that Argus Research knew or should have known of this content prior to signing the Agreement in August 2001, and certainly well prior to November 2003.

Nor was Argus Research justified in its delay in filing suit over Argus Media's inclusion of share price information for energy companies. Despite Argus Research's actual or constructive knowledge of the content of Argus Media's publications prior to the signing of the Agreement, there is no mention of the content of the publications (as opposed to that of the trademark registration application) in that Agreement, nor did Argus Research otherwise make its objection known prior to filing this lawsuit in 2006. Finally, permitting Argus Research to raise these claims now would be unduly prejudicial to Argus Media, as Argus Media has made this information an important component of its publications for many years without objection from Argus Research. *See, e.g.*, *Conopco*, 95 F.3d at 192 (finding prejudice where defendant would have to redirect business and advertising expenses); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203(DLC), 2006 WL 1012939, at *34 (S.D.N.Y. Apr. 19, 2006) (same); *Deere & Co. v. MTD Holdings Inc.*, No. 00 Civ. 5936(LMM), 2004 WL 324890, at *18-*19 (S.D.N.Y. Feb. 19, 2004) (same). In light of all of these considerations, and unless Argus Research provides an adequate excuse for its delay, the Court holds

that Argus Research's claims relating to the inclusion of share price information in Argus Media publications is barred by laches.[5]

Argus Research's second claim, relating to Argus Media's use of the terms "ARGUS" and "ARGUS MEDIA" – in lieu of its earlier marks "PETROLEUM ARGUS" and "ENERGY ARGUS" – presents a somewhat more complicated question. Argus Media claims that Argus Research had constructive, and arguably even actual, knowledge of Argus Media's use of the new marks well before November 2003.[6] In support of this contention, Argus Media points to Mr. Dorsey's email to Ms. Wagoner in March 2003, which included the argusonline.com and argusmediagroup.com URLs and specifically alerted Ms. Wagoner to the possibility of infringement, a point further reinforced by Mr. Hovis's observation of the Argus Media booth at the September 2004 conference, which was reported to Ms. Wagoner the next day. Especially in light of the parties' prior Agreement (and the concerns regarding infringement that the Agreement reflected), Argus Media asserts that these two events were sufficient to alert a reasonable person to the need to investigate further, and that such an investigation would have revealed Argus Media's "prominent" use of the relevant marks

---

[5] Argus Media also argues that any uses of "ARGUS" predating the Agreement or foreseeable thereafter are barred by acquiescence, on the ground that Argus Research's awareness of, and failure to object to, those uses constitutes the requisite "active consent." *See ProFitness*, 314 F.3d at 68. Because laches provides a sufficient ground for the Court's decision, however, it need not, and does not, determine whether acquiescence would also bar Argus Research's claims regarding the inclusion of share price information in Argus Media publications. As for the claims the Court will permit to proceed to trial, Argus Media may present at trial any evidence regarding its acquiescence defense that Argus Media considers appropriate in light of the Court's ruling and any additional evidence offered at trial by Argus Research.

[6] Argus Media devotes several pages of its filings to demonstrating that Argus Research was well aware of Argus Media and its publications. However, the Court does not believe these facts are relevant (or contested); rather, the question is whether or when Argus Research became aware of the specific uses of the "ARGUS" and "ARGUS MEDIA" marks at issue here.

by March 2003. *See* Defendants' Reply Memorandum [doc. # 102] at 8. Thus, Argus Media argues that constructive knowledge of its use of the "ARGUS" and "ARGUS MEDIA" marks should be imputed to Argus Research, and that the latter's claims regarding these marks should consequently be barred, just as its claims regarding the content of Argus Media's publications are barred.

The Court agrees that Argus Research had constructive, if not actual, knowledge of Argus Media's use of the "ARGUS" and "ARGUS MEDIA" marks as of March 2003. No reasonable jury, even taking the evidence in the light most favorable to Argus Research, could conclude that Mr. Dorsey's email to Ms. Wagoner was insufficient to put Argus Research on notice of these facts. Ms. Wagoner received an email indicating a possible infringing trademark use, and all she needed to do was to click on the link already provided in the email in order to discover all there was to know about Argus Media's evidently objectionable use of the "ARGUS" and "ARGUS MEDIA" marks. In such circumstances, the Court believes that the presumption of unreasonable delay is more than warranted. Further, Argus Media has made a sufficient showing of prejudice, for it has advertised its new marks, developed websites using those marks, and printed perhaps hundreds of thousands of publications under the new marks. An injunction requiring Argus Media to return to the use of "PETROLEUM ARGUS" or "ENERGY ARGUS & Design" would undoubtedly be quite costly, both monetarily and in good will. *See, e.g., Juicy Couture, Inc.*, 2006 WL 1012939, at *34; *Deere & Co.*, 2004 WL 324890, at *18-*19. Laches, then, would bar Argus Research's claims relating to the use of "ARGUS" and "ARGUS MEDIA," unless Argus Research provides sufficient excuse for its delay.

2.      **Justification for the Delay.**     In response, Argus Research offers several justifications for its delay in bringing suit – namely, lack of good faith, the pendency of existing litigation, and

progressive encroachment. The Court believes that there are genuine issues of material fact in dispute regarding certain of these responses that prevent a grant of summary judgment to Argus Media on the basis of laches.

Given that a lack of good faith, which "requires a showing of fraudulent intent to capitalize on a competitor's reputation or good will," *Black Diamond*, 2005 WL 2076279, at *5, is a "dispositive, threshold inquiry," *Hermes Int'l*, 219 F.3d at 107, the Court begins there. Argus Research appears to claim that Argus Media should not be permitted to avail itself of the laches defense given its bad faith in attempting to re-brand its publications "under the radar." *See* Pls.' Mem. in Opp'n [doc. # 91] at 25-26. However, Argus Media's websites included these marks as of 2002, certain of their publications were issued under the new marks beginning in 2002, and Argus Media also started advertising their new marks in the *Financial Times* in February 2003. While the parties disagree as to whether Argus Research had actual knowledge of these developments, there is no indication in the record assembled for the Court that Argus Media was attempting to hide its use of the "ARGUS" and "ARGUS MEDIA" marks from Argus Research or anyone else. *See Black Diamond*, 2005 WL 2076279, at *5 (denying excuse of bad faith concealment where plaintiff could have discovered infringing use by examining defendant's catalogs, retail store and trade show displays, or website). As the Court's recitation should make clear, the Court has significant doubts that Argus Research has provided, or could provide, sufficient evidence to permit a reasonable jury to find that Argus Media has engaged in bad faith. However, because the same witnesses and evidence Argus Research offers regarding Argus Media's intent be relevant to Argus Research's claim of progressive encroachment, which must proceed to trial, and because lack of good faith is ordinarily a factual issue, the Court believes the more prudent course is to allow Argus Research's

claim of a lack of good faith on Argus Media's part to proceed to trial as well. In light of these same considerations, the Court limits Argus Research's evidence of bad faith to those aspects of its progressive encroachment claim that survive summary judgment, as discussed below.

Turning next to the pendency of litigation, Argus Research claims that pursuit of trademark enforcement actions against other infringers is an excuse for any delay. However, Argus Research does not cite to any Second Circuit cases for this proposition. Even assuming that other trademark litigation were a sufficient excuse, the Court does not believe that Argus Research has made a sufficient showing to qualify for relief under this theory. For although Argus Research points to two other infringement cases it prosecuted in 2004 and 2005, an examination of the docket sheets reveals that the first lawsuit, commenced in 2005, settled after a little over six months and without even an answer by the defendant, and that the second was filed in August 2006 and settled soon after the defendant answered, in February 2007 (by which time the current lawsuit was already pending). *See* Ewing Reply Decl. [doc. # 104], Exs. V, A. Argus Research has provided no evidence to suggest that these matters were more time-consuming than they appear from the docket sheets or that they otherwise impeded Argus Research's ability to bring this suit. The Court also notes the factual differences between these circumstances and those present in *Cuban Cigar Brands N. V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090 (S.D.N.Y. 1978), the case Argus Research identifies as supporting its position. Although the court in *Cuban Cigar Brands* did recognize that "a trademark owner is not bound to take on more than one infringer at a time," *id.* at 1097 n.28, the court went on to note that "it was only in 1973, after prevailing at trial and on appeal in the bitterly contested and extended litigation with the Cuban government and others, that plaintiff was even assured it still had a mark to protect. Indeed, that very litigation, which extended over a period of more than ten years,

establishes that plaintiff was a vigilant defender of its rights." 457 F. Supp. at 1097. The limited nature of the prior litigation here, its overlap with the current suit, and the dearth of evidence suggesting actual distraction all mean that no reasonable jury could conclude that the other suits brought by Argus Research in this time frame excused its otherwise unjustifiable delay.

By contrast to the claim of existing litigation, the Court concludes that there are several genuine issues of material fact in dispute regarding Argus Research's claims of progressive encroachment. As the Court noted above, the doctrine of progressive encroachment permits a plaintiff to wait to bring suit until she has a "provable infringement claim"; she need not file an action at the first sign of incipient infringement. There are three possible ways in which Argus Research argues that Argus Media progressively infringed on Argus Research's mark. The first focuses on a gradual change in the content of Argus Media's publications. But as the Court has found that the content did not change in any material way, any minor developments in the content of Argus Media's reports cannot support a progressive encroachment defense.

Argus Research's second argument is grounded in a change in the market for Argus Media's products. Specifically, Argus Research claims that Argus Media has over time begun to market its products to hedge funds and investment banks, both of which are traditional subscribers to Argus Research's reports and neither of which historically constituted a significant part of Argus Media's subscription base. Argus Media, on the other hand, says that its customer base has generally remained constant since November 2003 and consists primarily of energy companies, energy traders, and large financial institutions with energy trading capabilities. Mr. Hovis, for example, testified at his deposition that he first learned of Petroleum Argus, Argus Media's predecessor company, in 1976 or 1977, when he worked at First Boston, "an investment banking broker/dealer firm, principal

trading firm, in other words, a full house investment banking firm." Ewing Decl. [doc. # 74], Ex. I at 106-07. An examination of Argus Media's top 50 clients for the years 2006 and 2007 also reveals that investment institutions are scarce, and heavily outnumbered by large energy companies. *See* Binks Reply Decl. [doc. # 103], Exs. LL, MM. Finally, Euan Craik, an Argus Media officer, testified at his deposition that Argus Media continues to sell its information to large investment banks, but that hedge funds are "not a very promising market for us because they tend to have reasonably small staffs" and that as a result, Argus Media was "not actively seeking out hedge funds" as clients. Ewing Reply Decl. [doc. # 104], Ex. Z at 109-10.

While the Court at this stage is not required to believe the Argus Media witnesses, Argus Research has not provided any information or documentation to the contrary despite intensive discovery; instead, Argus Research relies entirely on supposition or downright exaggeration.[7] In light of the evidence provided by Argus Media – which Argus Research has not refuted – Argus Research cannot sustain a claim of progressive encroachment on the basis of material changes in Argus Media's clientele, for the simple reason that there were no such changes.

Finally, Argus Research alleges that Argus Media progressively infringed on the "ARGUS" mark through Argus Media's gradual expansion in the use of "ARGUS" and "ARGUS MEDIA" as

---

[7] Argus Research has also demonstrated a lamentable tendency to misstate evidence, particularly the deposition testimony of certain Argus Media employees. For example, Argus Research asserted that an Argus Media employee, Karen Johnson, testified at her deposition that Argus Media had recently increased its revenue from certain financial institutions, *see* Pls.' Mem. in Opp'n [doc. # 91] at 24, without also noting that she further explained that many of those institutions were previous subscribers to Argus Media's publications. Even more egregiously, Argus Research edited the deposition testimony of an Argus Media officer, Euan Craik, to suggest that Argus Media was interested in increasing its subscribers among hedge funds, *see* Corea Decl. [doc. # 91-2], Ex. 33, when in reality, Mr. Craik stated that hedge funds were not a very promising market for Argus Media's publications.

the mark under which it publishes its reports, coupled with a phasing out (or at least fading away) of the "PETROLEUM ARGUS" and "ENERGY ARGUS & Design" marks by which Argus Media had previously been known. (The Court uses the short-hand "re-branding" to encompass all of this conduct). Argus Research undoubtedly had constructive knowledge of Argus Media's use of the "ARGUS" and "ARGUS MEDIA" marks by March 2003 as a result of the Dorsey email, as explained above. However, it is unclear from the record how widespread Argus Media's re-branding or use of the new marks was by this date, and Argus Media's counsel was unable at oral argument to provide the Court with a representation as to the proportion of the transition completed by March 2003.

This lack of clarity is particularly problematic because Argus Media admitted at oral argument that changes were still being made as late as 2007.[8] *See also* Corea Decl. [doc. # 91-2], Ex. 24 (internal Argus Media email describing progressive rollout of new titles to include "ARGUS" or "ARGUS MEDIA" over period of six months in 2004). Additionally, the record is unclear regarding the level of confusion possibly resulting from Argus Media's use of the new marks; while Argus Research suggested that confusion has recently spiked, Mr. Hovis testified at his deposition that he received dozens of phone calls intended for Argus Media as long ago as the 1980s and 90s. *See* Ewing Reply Decl. [doc. # 104], Ex. S at 176; *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (finding insufficient likelihood of confusion where "there is no reason to believe that confusion represented by the [misdirected] phone calls could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation"). *But see* Corea

---

[8] The Court notes that, to the extent Argus Media continued expanding its use of the "ARGUS" and "ARGUS MEDIA" marks after the filing of this lawsuit, it may not be able to demonstrate prejudice regarding that phase of its re-branding efforts.

Decl. [doc. # 91-2], Ex. 28, at AM002844 (email from Daniel Massey of Argus Media noting the potential for confusion if "Argus" were used alone, as opposed to "Argus Media").

In light of these factual disputes, then, the Court believes that a more developed record is necessary in order to determine whether progressive encroachment due to re-branding may appropriately allow Argus Research to avoid the bar of laches that would otherwise apply to Argus Research's claims. The Court notes, however, that given Argus Research's constructive or actual knowledge of at least some use by Argus Media of the marks in question prior to November 2003, damages may well not be available or may be circumscribed substantially. *See ProFitness*, 314 F.3d at 68.

To summarize, then, the Court grants summary judgment on the basis of laches to Argus Media with respect to Argus Research's claims regarding the content of and subscribers to Argus Media's publications. The Court denies summary judgment with respect to Argus Research's claim regarding the re-branding of Argus Media's publications. At trial, Argus Research may present evidence of progressive encroachment as well as evidence of Argus Media's intent to infringe on Argus Research's marks (i.e., lack of good faith) concerning that re-branding. Argus Research may not present further evidence regarding any other excuse for its delay in bringing suit.

## V.

In addition to its Lanham Act claims, Argus Research has also asserted a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"). CUTPA is co-extensive with the Lanham Act in trademark cases.[9] *See Conn. Cmty. Bank v. Bank of Greenwich*, No. 06cv1293 (JBA), 2007 WL

---

[9] To the extent Argus Research seeks to maintain a CUTPA claim on the basis of Argus Media's alleged misrepresentations to the U.S. Patent and Trademark Office in certain of its trademark registration applications, the Court rejects that claim as deficient as a matter of law

1306547, at *3 (D. Conn. May 2, 2007) (citing *Nabisco Brands, Inc. v. Kaye*, 760 F. Supp. 25, 29

(D. Conn. 1991)).  In addition to its arguments relating to laches and acquiescence, however, Argus

Media maintains that Argus Research's CUTPA claim is barred by the three-year statute of

limitations.  The Court agrees.

The CUTPA statute of limitations is an occurrence statute, meaning that the limitations

period begins to run from the "date of the act or omission complained of," rather than the time at

which the plaintiff discovers that injury.  *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212 (1988)

(quotation marks omitted); *see id.* at 212-13.  Argus Media claims that the relevant occurrence is the

first use of "ARGUS" or "ARGUS MEDIA" as a trademark, which took place in 2002, but certainly

no later than March 2003, when Ms. Wagoner was alerted to Argus Media's use of these marks by

Mr. Dorsey's email.  Argus Research, on the other hand, argues that the relevant occurrence is Argus

Media's re-branding campaign, which did not begin until 2004, i.e., within the statute of limitations

period.  However, Argus Research provides no rationale on which to accept its assertion.  The

Connecticut Supreme Court has interpreted CUTPA's language as "preclud[ing] any construction . . .

_____

because Argus Media amended the application prior to publication.  *See Hurley Int'l LLC v. Volta*, 82 U.S.P.Q.2d 1339, 1344 n.5 (T.T.A.B. 2007) ("[A] misstatement in an application as to the goods or services on which a mark has been used does not rise to the level of fraud where an applicant amends the application prior to publication."); *Kipling Apparel Corp. v. Rich*, Opp'n 91170389, 2007 WL 1207190, at *3 (T.T.A.B. Apr. 16, 2007) (same); *Universal Overall Co. v. Stonecutter Mills Corp.*, 379 F.2d 983, 984-85 (Ct. Cust. App. 1967) (same).  Even if such statements could be considered fraudulent, "acts relating to trademark applications and domain name registrations do not occur 'in the conduct of any trade or commerce,' as those terms are defined by the statute." *Omega S.A. v. Omega Eng., Inc.*, No. 3:01 CV 2104 SRU, 2005 WL 3307277, at *8 (D. Conn. Dec. 6, 2005) ("Filing a trademark application or registering a domain name does not constitute: 'the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.'") (quoting Conn. Gen. Stat. § 42-110a(4)).  Nor has Argus Research claimed any "ascertainable loss" directly resulting from the trademark filings themselves, as required to sustain a CUTPA claim.

delaying the start of the limitation period until the cause of action has accrued or the injury has occurred." *Id.* at 212. At bottom, Argus Research is contesting Argus Media's *use* of the "ARGUS" and "ARGUS MEDIA" marks, not the re-branding campaign itself (which merely publicized Argus Media's use of those marks). Thus, Argus Media's first trademark use of "ARGUS" and "ARGUS MEDIA" is the relevant touchstone here, regardless of when Argus Media's re-branding campaign began, and regardless of any requirements under trademark law as to when Argus Research's cause of action had accrued. Finally, even if CUTPA were a discovery statute, which it is not, Argus Research would still have to explain why the constructive knowledge it received through Mr. Dorsey's email was not sufficient to put Argus Research on notice and start the statute of limitations running for purposes of the CUTPA claim. Needless to say, Argus Research provides no such explanation.

The Court also rejects the possibility of tolling on the basis of fraudulent concealment or a continuing course of conduct. Under § 52-595 of the Connecticut General Statutes,

> If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon *first discovers its existence*.

Conn. Gen. Stat. § 52-595 (emphasis added). In construing this statute, the Connecticut Supreme Court has explained that

> to prove fraudulent concealment, [plaintiffs are] required to show that [defendants]: (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) intentionally concealed these facts from the plaintiffs; and (3) concealed the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action.

*Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 105 (2007). Even assuming that all of the requirements for fraudulent concealment were met in this case – which would require a very generous construction of the factual record – Argus Research's constructive knowledge of Argus Media's use of the "ARGUS" and "ARGUS MEDIA" marks in March 2003 constituted discovery of its CUTPA claim and effectively began the statute of limitations under § 52-595. Thus, even assuming that Argus Research were able to prove that Argus Media had fraudulently concealed its introduction of the "ARGUS" and "ARGUS MEDIA" marks (and that itself is doubtful on this record), Argus Research's CUTPA claim, filed in November of 2006, would nevertheless be untimely.

Regarding the continuing course of conduct doctrine, as the Court stated in *OBG Technical Services, Inc. v. Northrop Grumman Space & Mission Systems Corp.*, 503 F. Supp. 2d 490 (D. Conn. 2007),

> there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, *there has been evidence of either a special relationship between the parties giving rise to such a continuing duty* or some later wrongful conduct of a defendant related to the prior act.

*Id.* at 510 (quoting *Neuhaus v. DeCholnoky*, 280 Conn. 190, 201 (2006)) (emphasis omitted). Argus Research has not alleged, nor could it credibly argue, that there is any special relationship between the parties. The contractual relationship between the parties reflected in the Agreement, for example, is not sufficient to create a special relationship under Connecticut law. *See, e.g., Thompson v. Prudential Ins. Co. of Am.*, No. CV990065632S, 2003 WL 21151630, at *1 n.3 (Conn. Super. Ct. May 6, 2003) ("[T]he plaintiff has failed to satisfy [the special relationship] requirement of the

doctrine because a 'contractual relationship' does not give rise to an ongoing legal duty and our Supreme Court has so held.") (citing *Fichera*, 207 Conn. at 210); *Partitions, Inc. v. Blumberg Assocs., Inc.*, No. CV980576664S, 2001 WL 1332174, at *5 (Conn. Super. Ct. Oct. 9, 2001) ("[T]he contractual relationship was not a 'special relationship' for the purpose of the continuing course of conduct doctrine: generally these relationships have been attorney-client, physician-patient, or some related sort of fiduciary-type relationship in which one party reasonably reposes trust in the other to exercise continuing care on his behalf."). Thus, the Court concludes that Argus Research's CUTPA claim is barred by the statute of limitations, and Argus Media's motion for summary judgment is granted on that basis.

## VI.

Argus Media's final argument is that Argus Research's trademark dilution claim under § 43(c) of the Lanham Act must fail because Argus Research's brand is insufficiently famous to qualify for protection against dilution. The current version of § 43(c) went into effect on October 6, 2006 as part of the Trademark Dilution Revision Act of 2006 ("TDRA") and provides that

> [s]ubject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). The statute goes on to define a "famous mark" as one that is "*widely recognized by the general consuming public* of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis added). In determining whether a mark is famous, the statute provides four non-exclusive factors for a court

to consider: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark has been registered. By its very language, then, the statute denies protection against dilution to owners of marks that are famous only in niche markets, or to marks that were already in use before the plaintiff's mark became famous. *See* 15 U.S.C. § 1125(c)(1), (c)(2)(A).

Argus Research must therefore demonstrate that its "ARGUS" mark is "widely recognized by the general consuming public," 15 U.S.C. § 1125(c)(2)(A), and was famous in this sense prior to Argus Media's use of the "ARGUS" and "ARGUS MEDIA" marks beginning in 2001. Even under the former version of § 43(c), the Second Circuit established a stringent standard for dilution claims. In *Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004), the court required that the plaintiff show "that the senior mark possesses both a significant degree of *inherent* distinctiveness and, to qualify as famous, a high degree of *acquired* distinctiveness." *Id.* at 449 (quotation marks and alteration omitted). As the court noted,

> [T]he element of fame is the key ingredient. This is because, among the various prerequisites to [a Federal Trademark Dilution Act] claim, the one that most narrows the universe of potentially successful claims is the requirement that the senior mark be truly famous before a court will afford the owner of the mark the vast protections of the FTDA.

*Id.*; *see also TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001) ("The examples of eligible 'famous marks' given in the House Report – Dupont, Buick, and Kodak – are marks that for the major part of the century have been household words throughout the United States.") (citation omitted); *Christopher D. Smithers Found., Inc. v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 00 Civ. 5502, 2003 WL 115234, at *5 (S.D.N.Y. Jan. 13, 2003) ("[T]he degree of fame required

for protection under the FTDA must exist in the general marketplace, not in a niche market. Thus, fame limited to a particular channel of trade, segment of industry or service, or geographic region is not sufficient to meet that standard.") (citation omitted); *Nike, Inc. v. NikePal Int'l, Inc.*, No. 2:05-cv-1468-GEB-JFM, 2007 WL 2782030 (E.D. Cal. Sept. 18, 2007) (finding Nike to be a famous mark).

Given the amendment to § 43(c) and the difficulty of demonstrating fame under both the statutory language and existing Second Circuit case law, the Court questions whether Argus Research could offer sufficient evidence to permit a reasonable jury to conclude that its mark qualifies for dilution protection. John Eade, Argus Research's CEO, testified at his deposition that Argus Research was only beginning to investigate direct-to-consumer sales, *see* Ewing Decl. [doc. # 74], Ex. L at 269-70; the vast majority of its publications are distributed by investment banks such as Charles Schwab, Morgan Stanley, and Merrill Lynch. Although these publications may reach up to 21 million account holders, Argus Research has presented no evidence to indicate that these account holders actually access Argus Research's materials or that they are aware of "ARGUS" as a mark. Further, Argus Research's revenues were less than $20 million annually through 2007, substantially less than other "famous" companies spend just on advertising. *See* Eade Declaration [doc. # 91-29] at 1-2; *Nike*, 2007 WL 2782030, at *3. Ms. Wagoner herself was asked at her deposition whether she thought the general consumer had heard of Argus Research, and she responded, "Yes. Excuse me, which general consumer? Someone buying Manolo, whatever those Blahnik shoes are, no. Somebody who is investing in the stock market, I think many of them do." Corea Decl. [doc. # 91-2], Ex. 63, at 222.

Thus, it is doubtful whether the evidence presented by Argus Research to date is sufficient to demonstrate the high level of awareness among the *general consuming public* required of famous marks under the TDRA. However, in *Savin* the Second Circuit held "more than a mere scintilla of evidence" of fame "a sufficient quantum of proof to submit the question to the finder of fact." *Savin*, 391 F.3d at 450.[10] In an abundance of caution, therefore, the Court will deny Argus Media's motion with respect to the fame of Argus Research's mark in order to permit Argus Research to submit additional evidence at trial. As the Second Circuit suggested in *TCPIP Holding Company*, that evidence may consist of a breakdown of Argus Research's advertising expenses and how effective those expenditures were, consumer surveys, press accounts, or other evidence of fame. *See* 244 F.3d at 99. The evidence submitted should be of a sort "that would enable a court to determine the extent or dimension of public recognition of the mark and whether it has fame sufficient to meet the requirement of the Act." *Id.* at 99-100. Of course, the Court may remove this issue from the jury's consideration if Argus Research fails to present sufficient evidence of fame at trial.

## VII.

In conclusion, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment [doc. # 72]. The Motion is GRANTED with respect to Argus Research's common law breach of contract and CUTPA claims, and those aspects of Argus Research's federal and common law trademark infringement, false designation, and unfair competition claims that are based upon the content of Argus Media's publications and the clientele subscribing to those

---

[10] In *Savin*, the plaintiffs demonstrated that they "spent over $20 million on advertising in 2002," had "annual revenues of $675 million," that their "products and services [were] regularly featured in print advertisements, trade magazines, and tradeshow promotions," and that their "advertisements [had] appeared in well known magazines such as *Newsweek*, *Time*, and *Business Week*." *Id.* at 450 (alteration omitted).

publications.  The Motion is DENIED with respect to those aspects of Argus Research's federal and common law trademark infringement, false designation, and unfair competition claims that are based upon changes in the masthead and presentation of Argus Media's publications, which was referred to as "re-branding" above, as well as Argus Research's federal dilution claim.

The Court will issue a separate scheduling order setting this case for trial.


IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut: June 3, 2008.**